UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALLEN F. BIALEK,

               Plaintiff,

v.

AMERICAN COLOR GRAPHICS, INC.,
and VERTIS, INC.,

               Defendant.

_____/

Case No. 09-10208

Hon. Sean F. Cox


OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND
GRANTING DEFENDANTS' MOTION TO STRIKE

      Plaintiff filed this action against his former employer, asserting age-discrimination

claims.  The matter is currently before the Court on the parties' cross-motions for summary

judgment and on Defendants' motion to strike.  The parties have briefed the issues and presented

oral argument on July 29, 2010.  After the hearing the Court requested supplemental briefs,

which both parties filed on September 8, 2010.  For the following reasons, the Court shall

GRANT Defendants' motion for summary judgment, DENY Plaintiff's motion for summary

judgment, and GRANT Defendant's motion to strike.

BACKGROUND

      Plaintiff Allen F. Bialek filed this action in Wayne County Circuit Court on December

10, 2008.  Thereafter, the action was removed to this Court based on federal-question

jurisdiction.  On May 28, 2009, Plaintiff filed his First Amended Complaint against Defendants

1

American Color Graphics, Inc. ("ACG"), d/b/a Vertis Communications, a New York

Corporation and Vertis, Inc. ("Vertis"), a Delaware Corporation.  Plaintiff's First Amended

Complaint asserts two counts: "Violation of Elliot-Larsen Civil Rights Act;" and "Violation of

the Age Discrimination in Employment Act."

       After the close of discovery, the parties filed cross-motions for summary judgment.

Pursuant to this Court's practice guidelines, Defendants' motion and supporting brief also

included a separate document entitled "Statement of Material Facts Not in Dispute" ("Defs.' stmt

of facts") (Doc No. 37-1).  In response, Plaintiff filed a "Counter-statement of Material Facts Not

in Dispute" ("Pl.'s counter-stmt.") (Doc No. 49).  In support of Plaintiff's motion for summary

judgment, Plaintiff also filed a "Statement of Material Facts Not in Dispute" ("Pl.'s stmt. of

facts") "Doc No. 48), and in response Defendants filed a "Counterstatement of Disputed Facts"

("Defs.' counter-stmt.") (Doc. No. 55).

       The parties' statements and evidence support the following material facts.

       Plaintiff was born on July 12, 1946.  (Defs.' stmt. of facts at ¶ 1; Pl.'s counter-stmt. at ¶

1).  In 1965, he began working for Greater Buffalo Press, a predecessor of ACG.  (Defs.' stmt. of

facts at ¶ 2; Pl.'s counter-stmt. at ¶ 2).  After Greater Buffalo Press, Plaintiff worked for Sullivan

Graphics, another predecessor of ACG, and then for ACG itself.  (Defs.' stmt. of facts at ¶ 3;

Pl.'s counter-stmt. at ¶ 3).  In 1989, Plaintiff began working in ACG's sales department.  (Defs.'

stmt. of facts at ¶ 4; Pl.'s counter-stmt. at ¶ 4).

<u>Plaintiff Inquires About Early Retirement In 2003</u>:

On November 19, 2003, Plaintiff's wife, Pamela Bialek, emailed Jacki DiPirro[1], an ACG Human Relations Manager, on Plaintiff's behalf.  (Defs.' stmt. of facts at ¶ 21; Pl.'s counter-stmt. at ¶ 21).  Pamela Bialek wrote, "Let's say Al desires to retire at age 62 at which time he will have 43 years with the Company.  Am I understanding this (ACG's pension-plan manual) to indicate that Al would receive the FULL amount due him with no deduction?"  (Defs.' stmt. of facts at ¶ 22; Pl.'s counter-stmt. at ¶ 22).  Pamela Bialek also asked whether ACG would continue to provide medical coverage if Plaintiff retired at age 62.  (Defs.' stmt. of facts at ¶ 24; Pl.'s counter-stmt. at ¶ 24).

Jacki DiPirro replied in an email dated November 21, 2003, stating, "You are correct.  If Al retired at any time after age 62 (7/1/08) there would be NO reduction in the $2,425 monthly benefit . . . ."  (Defs.' stmt. of facts at ¶ 23; Pl.'s counter-stmt. at ¶ 23).  She also stated, "Currently, ACG does provide retirees with medical insurance. . . . Please note that providing health coverage to retirees is at the discretion of ACG and may be changed or terminated at any time."  (Defs.' stmt. of facts at ¶ 24; Pl.'s counter-stmt. at ¶ 24).

<u>In 2007, Plaintiff Learns Of The Potential Merger Of ACG And Vertis, Inc.</u>:

In or around mid-2007, Plaintiff learned of the potential merger of ACG and Vertis, Inc. (Defs.' stmt. of facts at ¶ 7; Pl.'s counter-stmt. at ¶ 7).

Prior to the merger, both companies were involved with the print-advertising business (Pl.s Br. Ex. 3 at p. 4),  and both companies were emerging from bankruptcy.  (Defs.' stmt. of

---

[1]Jacki DiPirro, the Manager for Human Relations Administration at ACG, is in her late forties (I-Defs. at ¶ 11; I-Pl. at ¶ 11).  She reported directly to Mike Spragge, the Senior Vice President of Human Resources at Vertis. (I-Defs. at ¶ 12; I-Pl. at ¶ 12).

facts at ¶ 16; Pl.'s counter-stmt. at ¶ 16).  Plaintiff understood that there was a good chance that ACG and Vertis would conduct a "reduction in force" in late 2008, because of the merger, the state of the printing industry, and the state of the economy in general.  (Defs.' stmt. of facts at ¶ 17; Pl.'s counter-stmt. at ¶ 17).  In fact, both companies were already cutting employees at the time of the merger.  (Defs.' stmt. of facts at ¶ 18; Pl.'s counter-stmt. at ¶ 18).

Pre-Merger Communications Regarding Retirement:

On or about July 29, 2007, Plaintiff sent an email to Mike Boyle,[2] which was copied to Denis Longpre.  (Defs. Ex. 6).  Plaintiff's email stated:

> Mike, following is what we recently discussed with respect to my objective in regards to the merger announcement of Vertis and American Color.
> First and foremost, it is not my intention to leave or retire.  I have enjoyed my rewarding 42-year tenure with this company and, if the merger goes through, I hope it works out for the many great people on both sides.
> That said, if the situation doesn't work for me and my family there is one last milestone I would like to accomplish in my long career with this company – that being afforded both myself and my family with the benefits of an early retirement.

(Defs. Ex. 6 at p.1).

On July 12, 2008, Plaintiff turned 62 years old, and became eligible for early retirement. (Defs.' stmt. of facts at ¶ 8; Pl.'s counter-stmt. at ¶ 8).

On August 11, 2008, Pamela Bialek emailed Kathy Wesolowski, an ACG employee, and explained that Plaintiff had not taken his yearly vacation because he was "holding off till his

---

[2]In 2008, Plaintiff reported to Mike Boyle, Senior Vice President of Newspaper Sales. (Defs.' stmt. of facts at ¶ 9; Pl.'s counter-stmt. at ¶ 9).  Mike Boyle reported to Denis Longpre, Executive Vice President of Sales, who is in his mid-fifties.  (Defs.' stmt. of facts at ¶ 10; Pl.'s counter-stmt. at ¶ 10).

4

62nd Birthday – had to hit that with at least 40 years with the company to get his pension without reduction for early retirement if he needed it . . ." (Defs. Ex. 7 at p.1).

On October 13, 2008, Todd Garvett, Director of Strategic Account Planning at Vertis sent an email to Mark Consigli, Senior Contracts Manager at Vertis, asking Consigli to prepare a broker's agreement for Plaintiff. Later that day, Garvett sent a follow-up email stating, "Al is an AC Sales rep who is going to be asked to leave but retain the account as a broker status." (Pl. Ex. G at p.1). Plaintiff was not copied on any of the emails. (Pl. Ex. G at p.1). There is no evidence that anybody from Vertis or ACG told Plaintiff that he was going to be asked to leave.

On October 16, 2008, Plaintiff spoke with Denis Longpre by telephone. Plaintiff recorded the conversation without Longpre's knowledge. (Defs.' stmt. of facts at ¶ 32; Pl.'s counter-stmt. at ¶ 32). During the conversation, Longpre referred to the email that Plaintiff had sent on July 29, 2007 regarding the possibility of early retirement. Plaintiff told Longpre that he was open to the possibility of a severance package and would be willing to consider a brokerage agreement, which would have allowed Plaintiff to continue working on certain accounts for a commission.

Both Plaintiff and Longpre referenced Plaintiff's age at several points during the conversation. The following exchanges took place:

> Longpre: Now these are probably some of the most bizarre times that any of us have ever gone through in our lives. But we haven't lived as long as you have, so you may have seen this somewhere before, I don't know.
>
> Plaintiff: Well somebody was saying that, uh '80 uh7' – was it '78 to '83 was bad? I mean I know they froze my salary – Pam always tells everybody for seven years and we never got a raise. So, uh. . .
>
> Longpre: '83, hell that was the year I graduated.

5

***

Plaintiff: Um, I'm young at heart, Denis. I have a lot of relationships out there. Um, I don't want to show a great company that I worked with for forty-three years disrespect. Um, and I don't want to show you disrespect so, um, you know, I just wanted to be treated the way you want to be treated like we talked, so if you want to try to put, if you want to put something together and we talk the next couple days, um, I'm very open to that.

Longpre: Okay. I'll see what we can figure out here. You just turned sixty-two, man.

Plaintiff: Yeah, yeah, I'm in a good place, Denis. I, I mean I really am, you know.

Longpre: Right and I know, and its – you know , I'm not telling you anything out of school. –you're a young sixty-two just like I'm a – I want to be as young as you when I'm sixty-two.

Plaintiff: Right . . . You're a dear friend, I, I know you have my best interests in heart as I have for you and let, let's move on.

Longpre: Okay. I just think that, just – I'm just saying this stuff out of school, this new company, the new Vertis is gonna be much more demanding out of salespeople for, for technology, pipeline, MSA type stuff, I mean really, really demanding on that end of it. Cross-selling, doing all those things that frankly, some of us older guys aren't all that good at. But they're going to be a lot more strict on the metrics.

Plaintiff: Sure

Longpre: Than we've ever been. Uh, I'm not, I mean, again, I'm not trying to push you one way or the other Al. If you want to stay on site and plug away with theses guys, I'm okay with that, too.

(Defs. Ex. 10).

Post-Merger Communications Regarding Retirement:

6

On October 17, 2008, ACG merged with Vertis.  (Pl.'s counter-stmt. at ¶ 15).

On October 22, 2008, Plaintiff had another telephone conversation with Longpre, which he again recorded without Longpre's knowledge.  During the conversation, Plaintiff asked, "I can still work here if I choose to, right?"  (Defs. Ex. 11 at p. 2).  Longpre replied, "Um, I think so."  (Defs. Ex. 11 at p. 2).

On October 24, Plaintiff and Longpre had a telephone conversation which Plaintiff secretly recorded.  Plaintiff and Longpre discussed the specifics of a potential severance package and brokerage agreement.   (Defs. Ex. 11 at p. 2-9).  During the conversation Longpre stated:

> Al, here's the deal.  You know, we had, there's a bunch of people overlapping and everything else we're looking to do and a bunch of people put on a list and uh what I got to find out what kind of commission, not kind of commission, what kind of severance packages the Vertis folks were offering.  It was, it was, they weren't very good.  As you know, Vertis has a different mindset with respect to how they deal with uh severance and everything else, so Boyle and I actually frankly kind of, thought of, came up with an idea and said, you know what, based on Al's e-mail to us last summer . . . you know, Al might, might want to do this from a broker's standpoint.

(Defs. Ex. 11 at p. 3).  Longpre discussed the possibility of Plaintiff working as a broker on the Dunham's and Farago accounts.  (Defs. Ex. 11 at p. 3-4).  Plaintiff also expressed his dissatisfaction with Vertis' four-month severance package.  (Defs. Ex. 11 at p. 4).  Later that day, Longpre emailed a broker agreement to Plaintiff.  (Pl.'s Ex S.)

On October 27, Plaintiff and Pamela Bialek had a telephone conversation with Jacki DiPirro and Mike Spragge.  During the conversation, Plaintiff and his wife asked DiPirro and Spragge about Vertis' medical plan for retirees.  (Defs. Ex. 14).  Spragge said that Vertis was planning to "freeze" the early retirement plan on January 1, 2009, and would only provide full

retirement benefits to people who retired before then.  (Defs. Ex. 14 at p. 2).

Also, during the conversation, Plaintiff asked Spragge if he could remain with the company.  Spragge replied, "I'm echoing what Denis said – things are tight and uh he's got to make some tough decisions . . ."  (Defs.' stmt. of facts at ¶ 72; Pl.'s counter-stmt. at ¶ 72).

<u>Alleged Actions Following The Merger:</u>

According to Plaintiff, in late October to mid-November, 2008, Vertis salespeople called on his three of his accounts including Detroit Newspapers, Farago & Associates, and the Baltimore Examiner.  (Defs.' stmt. of facts at ¶ 79; Pl.'s counter-stmt. at ¶ 79).  On November 11, 2008, Plaintiff sent an email to Denis Longpre and Mike Boyle asking to talk to them about the accounts. (Pl.'s Ex. P).

Plaintiff also claims that he did not have a functioning Vertis email account for a time and was not given access to the company intranet. (Defs.' stmt. of facts at ¶ 79; Pl.'s counter-stmt. at ¶ 79; Pl.'s Ex. O & N).  Plaintiff was not listed in the company directory.  (Defs.' stmt. of facts at ¶ 79; Pl.'s counter-stmt. at ¶ 79; Pl.'s Ex. M at 102:12-23).  He claims that he was not invited to sales meetings in Dallas and Chicago. (Defs.' stmt. of facts at ¶ 79; Pl.'s counter-stmt. at ¶ 79; Pl.'s Ex. K).

On November 21, 2008, Plaintiff retired.  (Defs.' stmt. of facts at ¶ 87; Pl.'s counter-stmt. at ¶ 87).  Plaintiff declined the broker agreement and the severance package. (Pl.'s stmt. of facts at ¶ 52 & 54; Defs.'s counter-stmt. at ¶ 52).

Plaintiff filed this action on December 10, 2008.

Plaintiff continues to participate in ACG's medical-benefit plan, and continues to collect a pension.  (Defs.' stmt. of facts at ¶s 87 & 94; Pl.'s counter-stmt. at ¶s 87 & 94).

ANALYSIS

Plaintiff's complaint alleges age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. §621 *et seq.* ("ADEA") and age discrimination under Michigan's Elliot-Larsen Civil Rights Act ("ELCRA").  At the summary judgment stage, a plaintiff must present either direct or circumstantial evidence to prevail on his discrimination claim.  *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).

Direct evidence is evidence that is free of inferences and that, if believed, requires a finding that "unlawful discrimination was at least a motivating factor in the employer's actions. *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006).  "It does not require the fact finder to draw any inferences to reach that conclusion." *Id.*  Evidence of discrimination is not considered direct evidence unless an unlawful motivation is explicitly expressed. *Id.*

Under the circumstantial-evidence approach, a plaintiff must show the existence of facts which create an inference of discrimination under the familiar *McDonnell Douglas* burden-shifting framework.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Once a plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate non-discriminatory reason for the plaintiff's discharge.  If the employer articulates such a reason, then the plaintiff has the burden of showing that the reason is a pretext for discrimination.  *Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309 (6th Cir. 2001).

Here, Plaintiff contends that he has direct evidence of discrimination, which he believes entitles him to summary judgment.  Plaintiff also contends that he can proceed with a circumstantial case under the *McDonnell Douglas* framework.

I.     Has Plaintiff Presented Direct Evidence Of Age Discrimination?

9

"Direct evidence is that evidence which, if believed, *requires* a finding that unlawful discrimination was at least a motivating factor in the employer's actions." *Amini*, 440 F.3d at 359 (emphasis added).  Evidence of discrimination is not considered direct evidence unless an unlawful motivation is explicitly expressed.  *Id.*  For example, a facially discriminatory employment policy or a corporate decision-maker's express statement to remove employees in the protected groups is direct evidence.  *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Here, Plaintiff has provided the Court with transcripts of recorded telephone conversations with his manager, Denis Longpre.  On October 16, 2008, during one such conversation, Longpre stated: "This new company, the new Vertis is going to be much more demanding on its sales people for technology, pipeline, MSA-type stuff.  I mean, really, really demanding on that end of it.  Cross-selling, *all of those things that, frankly, some of us older guys aren't all that good at.*"  (Defs. Ex 10 at p. 4) (emphasis added).  Longpre also made several references to Plaintiff's age during the conversation:

> Longpre: Now these are probably some of the most bizarre times that any of us have ever gone through in our lives.  But *we haven't lived as long as you have*, so you may have seen this somewhere before, I don't know.
>
> Plaintiff: Well somebody was saying that, uh '80 uh7' – was it '78 to '83 was bad?  I mean I know they froze my salary – Pam always tells everybody for seven years and we never got a raise. So, uh. . .
>
> Longpre: *'83, hell that was the year I graduated.*

(Defs. Ex 10 at p. 1) (emphasis added).

> Longpre: [Y]ou're a young sixty-two just like I'm a – I want to be as young as you when I'm sixty-two.

10

(Defs. Ex 10 at p. 4).

Longpre's statements are not direct evidence of age discrimination because a fact-finder would have to make an inference before finding that age discrimination was a motivating factor for Plaintiff's alleged constructive discharge. In other words, the statement, standing alone, does not reveal that age discrimination motivated any of Longpre's actions. While the statements may be circumstantial evidence that could support Plaintiff's age discrimination claim, they are not direct evidence.

In *Johnson v. Univ. of Cincinnati*, 215 F.3d 561 (6th Cir. 2000), the Sixth Circuit found direct evidence of discrimination where the university president allegedly said that "[w]e already have two black vice presidents. I can't bring in a black provost." Those comments were found to constitute direct evidence of discrimination because they required no inference to conclude that racial consideration motivated, at least in part, the employment decision at issue.

Direct evidence of discrimination was also found to exist in *Diaz v. City of Inkster*, 2006 WL 2192929 (E.D. Mich. 2006), where the plaintiff alleged that he was discriminated against on the basis of race. There, the plaintiff offered testimony that the city manager had said that there were some "members on the council that wanted a black [police] chief" and "when [the current chief] retires, you can bet the next chief is going to be black." *Id.* at *9. The court concluded that the comments of that decision-maker constituted direct evidence because they expressed that race was a determining factor in the employment decision at issue.

Plaintiff notes correctly, that this Court found direct evidence of age discrimination to exist in *Parker v. Charter Township of Redford*, 2007 WL 1675219 (E.D. Mich. 2007). In that case, the plaintiff presented evidence that, during a break from the township meeting in which

the plaintiff's position had been discussed, the township supervisor said that the plaintiff "is old, he's been here to[o] long, it's time for him to go, he needs to get out and make room for a younger man." *Id.* at *4. This Court concluded that the comments, which were related to the employment decision at issue and made by the decision-maker, would constitute direct evidence of age discrimination if believed by the jury.

Denis Longpre's recorded statements can be readily distinguished from the statements in *Johnson*, *Diaz*, and *Parker*. In *Johnson*, *Diaz*, and *Parker*, the statement alone demonstrates that discrimination was a motivating factor. Longpre's statements, however, cannot be considered direct evidence because "an unlawful motivation" is not explicitly expressed. *Amini*, 440 F.3d at 359.

Thus, Plaintiff is not entitled to summary judgment based on direct evidence. Further, to survive summary judgment, Plaintiff must proceed under the circumstantial-evidence approach.

II.   Has Plaintiff Established A Prima Facie Case Under The Circumstantial Evidence Approach?

Both parties acknowledge that the *McDonnell Douglas* framework applies to age-discrimination claims brought under the ADEA and the ELCRA and that Plaintiff bears the burden of establishing a prima facie case.

The elements necessary for a prima facie case are flexible because the facts necessarily will vary in cases, and the specification of the prima facie proof required is not necessarily applicable in every respect to differing factual situations. *Thompson v. Henderson*, 226 Fed.Appx. 455, 473 (6th Cir. 2007) (citing *McDonnell Douglas, supra*).

To establish a prima facie age-discrimination claim in this case, Plaintiff must satisfy the following elements:  1) he was forty years old or older at the time of the challenged action; 2) he

12

was qualified for the position; 3) he was subjected to an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  *See Rodriguez v. FedEx Freight East, Inc*., 487 F.3d 1001, 1008 (6th Cir. 2007).

Neither party contests that Plaintiff was over the age of forty at the time of the alleged discrimination: he was sixty two.  Additionally, neither party contests that Plaintiff was qualified for his position.  Thus, the first and second elements are satisfied and the Court need only consider whether Plaintiff has produced sufficient evidence to establish a constructive discharge and, if so, whether that constructive discharge occurred under circumstances giving rise to an inference of discrimination.

Both federal law and Michigan law recognize a constructive discharge as an adverse employment action.  Generally, to demonstrate a constructive discharge, a plaintiff must present evidence to show that: 1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) that the employer did so with the intention of forcing the employee to quit.  *Logan v. Denny's, Inc*., 259 F.3d 558, 568-69 (6th Cir. 2001).[3]

---

[3]In *Logan*, the Sixth Circuit adopted several factors that a district court should consider when applying the first prong of the constructive discharge inquiry:

> Whether a reasonable person would [ ] feel compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Id.* at 569.

13

The Sixth Circuit has also found an alternative basis for constructive-discharge claims. "Where ordinary charges of constructive discharge typically entail a decision on the part of the employee to resign in light of an intolerable working environment or some such allegation," the doctrine of constructive discharge also applies in cases where an employee resigns "with the understanding that he did not have the option of continued employment." *Scott*, 160 F.3d at 1128; *see also Johnson v. Rumsfeld*, 238 Fed. Appx. 105 (6th Cir. 2007).

In *Scott*, the plaintiff produced evidence that his employer told him that he would be "laid off." *Id.* Additionally, when the plaintiff asked about the prospect of future employment with the employer, the company did not provide him with any answers. *Id.* The court found that the plaintiff "chose retirement having no definite prospect of continued employment with the company." Under those circumstances, the court found that the plaintiff had produced sufficient evidence to show a constructive discharge.

The court of appeals applied the *Scott* analysis in *Adams v. Lucent Techs., Inc.*, 284 Fed. Appx. 296 (6th Cir. 2008) (unpublished). There, several plaintiffs brought ADEA claims against their former employer. During merger discussions with a competitor, the employer offered an early retirement package to employees with more seniority. The court determined that the facts did not support a finding of constructive discharge, because "the plaintiffs were not certain to lose their jobs and did not accept the [voluntary retirement benefits] as an alternative to layoff status." *Id.* at 302. The court also noted that despite the fact the employer was reducing its workforce, "the plaintiffs would have been protected from any layoffs by their relative seniority." *Id.*

The *Adams* court also found that the plaintiffs' "uncertainty regarding the effect of the

14

potential merger on their jobs does not translate into a constructive discharge." *Id.* (citing *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002) ("An employee who quits a job in apprehension that conditions may deteriorate later is not constructively discharged. Instead, the employee is obligated not to assume the worst, and not to jump conclusions too fast.").

Likewise, in *Quinn v. Newspaper Ass'n of Am.*, 1996 WL 515346 (6th Cir. 1996), the plaintiff chose early retirement after the company president told him that "there would be enormous [personnel] cuts, and the people let go would not receive nearly what was being offered in the early retirement incentive program." *Id.* at *3. The plaintiff in *Quinn* also experienced changes in his job duties. His supervisor directed him to put the supervisor's name on an automotive report that the plaintiff had previously published under his name. The plaintiff was not given a performance evaluation nor was he requested to submit project goals for the fiscal year.

The *Quinn* court noted, "Plaintiff's constructive discharge claim in essence is founded upon his view that under the circumstances choosing early retirement was the better alternative to remaining employed because he believed there was a *risk* associated with remaining at the company." *Id.* at *4 (emphasis added). The court found that there was no evidence to support a constructive discharge because, "in no way do the facts support that [the defendant] would have fired [the plaintiff] had he not elected to retire." *Id.*

As noted above, the "doctrine of constructive discharge applies to an employee who has accepted an offer of early retirement with the understanding that he or she has 'no definite prospect of continued employment with the company.'" *Adams,* 284 Fed. Appx. at 301 (quoting *Scott*, 160 F.3d at 1129).

15

Alternatively, "a constructive discharge exists 'if working conditions are such that a reasonable person in the plaintiff's shoes would feel compelled to resign.'" *Id*. (quoting *Scott*, 160 F.3d at 1127).

In support of his constructive-discharge claim, Plaintiff alleges that Defendants were in the process of reassigning his accounts to other sales people. Plaintiff claims that he had seven accounts, and that six of the seven accounts were to be reassigned according to the Vertis/ACG Interim Operational Plan Review dated August 28, 2008. (Pl.'s Supp. Br. Ex. 2). Plaintiff acknowledges, however, that Defendants did not tell him that they were transferring his accounts. Rather, Plaintiff claims that his contacts at two of the accounts informed him that Vertis salespeople had told them that the accounts had been re-assigned. Upon hearing this, Plaintiff wrote an email to Denis Longpre and Mike Boyle stating that he would like to talk about those accounts. (Pl.'s Ex. P).

Plaintiff further alleges that he did not have a functioning Vertis email account for a time and was not given access to the company intranet. (Defs.' stmt. of facts at ¶ 79; Pl.'s counter-stmt. at ¶ 79; Pl.'s Ex. O & N). He alleges that he was not invited to sales meetings in Dallas and Chicago. (Defs.' stmt. of facts at ¶ 79; Pl.'s counter-stmt. at ¶ 79; Pl.'s Ex. K). Finally, he alleges that he was not listed in the company directory. (Defs.' stmt. of facts at ¶ 79; Pl.'s counter-stmt. at ¶ 79; Pl.'s Ex. M at 102:12-23).

All of this, even when viewed in the light most favorable to Plaintiff, is insufficient to support a constructive discharge claim. First, the conditions were not so intolerable that a reasonable person in Plaintiff's shoes would feel compelled to resign. *See Scott*, 160 F.3d at 1127. Additionally, although a reasonable person in Plaintiff's shoes might anticipate a *risk* with

16

remaining at ACG, he would not conclude that he would be discharged.  *See Quinn,* 1996 WL

515346.  Both Vertis and ACG were emerging from bankruptcy and in the process of a merger.

Both companies were undergoing a significant transition.  Plaintiff admits that no representative

of Defendants ever told him that he was going to be discharged.  (Defs.' stmt. of facts at ¶ 79;

Defs.' Ex. 2 at 139:20-143:9).  Likewise, Plaintiff admits that no representative of Defendants

ever told him that his accounts were to be reassigned.  (Pl.'s Supp. Br. at 2).

Several years before he had even learned of the potential merger, Plaintiff had expressed

interest in taking an early retirement, and he was in the process of negotiating a broker

agreement and severance package.  To the extent that Defendants did not include Plaintiff in

their post-merger plans, Defendants had a good reason: they believed that Plaintiff was going to

retire.  Plaintiff has not produced any evidence that the employer deliberately created intolerable

working conditions with the intention of forcing the employee to quit.  *See Logan v. Denny's,*

*Inc.,* 259 F.3d 558, 568-69 (6th Cir. 2001).

Finally, Defendants note that Plaintiff's age enabled him to take an early retirement with

medical benefits, something that none of the younger employees were allowed because the

company policy changed on December 1, 2008, shortly after Plaintiff retired.  Plaintiff was able

to choose this option, in light of the risk associated with remaining at the company.  *See Quinn,*

1996 WL 515346.  Younger employees did not have the same option.

Because Plaintiff has failed to present evidence that Defendants constructively

discharged him, he cannot satisfy the third element of the prima facie case.  *See Rodriguez*, 487

F.3d at 1008.  Accordingly, the Court shall GRANT Defendants' motion for summary judgment

and DENY Plaintiff's motion for summary judgment.

III.    <u>Defendants' Motion To Strike</u>

Defendant also moves to strike Plaintiff's Hearing Exhibit 1, which the Court admitted at the summary judgment hearing on July 29, 2010.  Because Plaintiff admits that the exhibit was unintentionally altered, the Court shall GRANT Defendant's motion.  The Court notes, however, that an unaltered version of the same document was submitted as Exhibit 2 to Plaintiff's supplemental brief.

CONCLUSION & ORDER

For the reasons stated above, the Court GRANTS Defendants' motion for summary judgment, DENIES Plaintiff's motion for summary judgment, and GRANTS Defendants' motion to strike.

IT IS SO ORDERED.


<u>S/Sean F. Cox</u>
Sean F. Cox
United States District Judge


Dated:  January 3, 2011

2:09-cv-10208-SFC-VMM   Doc # 71   Filed 01/03/11   Pg 19 of 19   Pg ID 1169

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALLEN F. BIALEK,

                                                    Case No. 09-10208

            Plaintiff,

                                                    Hon. Sean F. Cox

v.

AMERICAN COLOR GRAPHICS, INC.,
and VERTIS, INC.,

            Defendant.

_____/


**<u>PROOF OF SERVICE</u>**


        I hereby certify that a copy of the foregoing document was served upon counsel of record on January 3, 2011, by electronic and/or ordinary mail.


                                    <u>S/Jennifer Hernandez                    </u>
                                    Case Manager